# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2042 | **DATE** | 5/30/2000 |
| **CASE TITLE** | ELIZABETH KINNEY, et al. vs. COOK COUNTY SCHOOL BUS, INC. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Motion for Preliminary Injunction

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   The petition for temporary injunction under Section 10(j) of the National Labor Relations Act [1-1] is granted. Cook County School Bus, Inc. is ordered to recognize the International Brotherhood of Teamsters, Local Union No. 744 and is prohibited from operating its Dedicated Driver Drawing Program pending final decision on the merits in the administrative proceeding before the National Labor Relations Board. ENTER MEMORANDUM OPINION AND ORDER

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JUN - 1 2000 date docketed | | |
| | Docketing to mail notices. | | | 24 |
| X | Mail AO 450 form. | 15 docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | |
| | 00 MAY 31 PM 4:43 | 5/30/2000 date mailed notice | | |
| jad | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**JUN - 1 2000**

ELIZABETH KINNEY, REGIONAL       )
DIRECTOR FOR REGION 13 OF THE    )
NATIONAL LABOR RELATIONS BOARD,  )   No. 00 C 2042
FOR AND ON BEHALF OF THE NATIONAL )
LABOR RELATIONS BOARD,           )   Suzanne B. Conlon, Judge
                                 )
                    Plaintiff,   )
                                 )
        v.                       )
                                 )
COOK COUNTY SCHOOL BUS, INC.     )
                                 )
                    Defendant.   )

## MEMORANDUM OPINION AND ORDER

The International Brotherhood of Teamsters, Local Union No. 744
("the union") filed unfair labor practice charges against Cook
County School Bus, Inc. ("County School Bus" or "the company") with
the National Labor Relations Board ("the NLRB") on September 30,
1999 and January 6, 2000 pursuant to the National Labor Relations
Act ("the Act"), 29 U.S.C. §158. NLRB General Counsel, by Elizabeth
Kinney, Regional NLRB Director for Region 13 ("Kinney"), petitions
this court for a preliminary injunction against the company
prohibiting the alleged unfair labor practices pending completion
of the administrative proceeding before the NLRB, pursuant to
Section 10(j) of the Act, 29 U.S.C. §160(j).

## BACKGROUND

24

The background facts are taken from the administrative hearing before the NLRB on April 12 and 13, 1999, and from additional evidence submitted by the parties.[1]

## I    The parties

County School Bus is a corporation based in Arlington Heights, Illinois, engaged in the school bus and related transportation business.  Until the events leading to this dispute, the union[2] has been the exclusive collective bargaining representative of all bus drivers employed by the company since at least 1980.  John Bernish is president, Robert Smith is general manager, and Sharon Pierluissi is assistant manager of the company.  Charles Walker is president of the union and John McGinn is the union's negotiator.

## II    The parties' relationship

The company and the union have maintained a collective bargaining relationship for almost twenty years and have negotiated nine collective bargaining agreements.  All of the agreements have

---

[1]Citations to the transcript are "Tr. _"; citations to the union's transcript exhibits are "Tr. CP (charging party) Ex. _";citations to the company's exhibits are, "Tr. E (employer) _"; citations to Kinney's exhibits are "Tr. GC (general counsel) Ex. _".  Citations to Kinney's supplemental exhibits are "Supp. Ex. _".

[2]The union's official name is the Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, School, Sightseeing, Charter Bus Drivers, General Promotional Employees, and Employees of Affiliated Industries, Maltsters, Laborers, Syrup, Yeast, Food, Vinegar, Brewery, Recycling, and Miscellaneous Workers of Chicago and Vicinity, Illinois, Local Union No. 744, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America.

been two or three years in duration and every agreement has contained a rollover clause in the termination language of Article 22 or 23. The rollover clause allows the contract to remain in effect from year to year after its expiration date unless one party gave notice of its intent to terminate the agreement. Beginning with the 1989 agreement, the rollover clause in each agreement stated that the contract would remain in effect from year to year after its expiration date "unless terminated by mutual consent . . . or unless either party shall notify the other, sixty (60) days prior to November 30 [of the expiration year] or November 30th of any year thereafter, of its desire to terminate or amend" the agreement. Tr. GC Ex. 5-13. Prior to the current agreement, none of the parties' previous agreements contained a reopener provision in the same article as the rollover clause.

### III  The current collective bargaining agreement

The current agreement runs from 1998 until 2001. Negotiations for the contract began in September 1998. Initially, the union desired a two-year contract, while the company wanted a three-year term. In November 1998, the company made a final offer that called for a three-year term, but the union membership rejected the proposal in December 1998. The parties met for two more bargaining sessions before resubmitting the agreement to the union members for ratification. During negotiations, both the company and the union emphasized their unhappiness with the charter assignment system.

McGinn suggested forming a committee to discuss charter bidding during the term of the new contract. The union proposed a contract reopener for renegotiating the way in which charters are assigned and added the reopener to Article 23 of the agreement. The clause allowed the contract negotiations to be reopened solely for the purpose of changing the way the company and the union dealt with charters. The company made an amended final offer that was rejected by the employees on January 12, 1999. After further negotiations, the company again amended its wage proposal and the employees ratified the contract, including the limited reopener and a three-year term, on January 29, 1999.

After the agreement was ratified, the union prepared the contract for signing. The final contract included both a rollover clause and the reopener proposed by the union. Article 23 of the final agreement reads:

> This contract shall become effective the 1st day of December, 1998 and shall remain in full force and effect through November 30, 2001 and continue in full force and effect year to year thereafter, unless terminated by mutual consent of the parties hereto, or unless either party shall notify the other, sixty (60) days prior to November 30, 1999, or November 30th of any year thereafter, of its desire to terminate or amend this agreement.

> Local 744 may notify Cook County School Bus in writing of its desire to reopen this Agreement for negotiations, but provided further, however that such negotiations shall be limited to bidding on charters in Article 12. This Agreement and all other Articles and Sections of this Agreement shall remain in full force and effect as herein above set forth. This reopener shall not extend past November 30, 2000.

Tr. GC Ex. 13. As customary with the parties, the union prepared the contract, including filling in the dates. Neither party was represented by counsel at the negotiations and neither had counsel present when they signed the agreement.

Kinney and the union claim the union inadvertently entered the wrong date in Article 23 and wrote November 30, 1999 in the rollover clause by mistake. They assert the date should have read November 30, 2001, the expiration of the contract. Every contract between the company and the union since 1980 contained a rollover clause. Beginning in 1989, the clause read that the contract would remain in effect from year to year after its expiration unless terminated by mutual consent or one party gave the other notice of its intent to terminate within sixty days of November 30 of the expiration year. Throughout negotiations and the ratification votes, the parties used contract drafts that contained the issues in dispute but omitted provisions of the prior contract that the parties did not intend to change. The drafts used in negotiations for the current contract did not include the rollover paragraph containing the date in dispute. Instead, the drafts simply contained the words "contract term – 3 years" in place of the paragraph. The language of the rollover clause was never discussed in the negotiations prior to ratification of the 1998 agreement. Kinney claims the union simply inserted the rollover language from the previous agreements and mistakenly wrote in November 30, 1999 instead of November 30, 2001. The company did not inform the union the date written in the

rollover clause was November 30, 1999; the union did not notice the alleged mistake until the company informed the union of its intention to terminate the contract in September 1999.

Pierluissi testified that she reviewed the contract sent to her by McGinn and she focused on the reopener language and saw nothing wrong with it. According to Pierluissi, McGinn contacted her in spring 1999 and in August 1999 to initiate discussion on charters pursuant to the reopener. She told him that it was the company's busy period and did not set up any meetings. Smith testified that he understood the contract could be reopened to negotiate charters and that there was the possibility the agreement could be terminated after one year when he signed the agreement.

## IV The company's termination of the bargaining agreement and withdrawal of union recognition

In July 1999, three drivers approached Smith and indicated they no longer wanted to be represented by the union. The drivers began obtaining signatures on a petition seeking to remove the union as their bargaining representative. Smith claims that by September 10, 1999, he knew the drivers had obtained signatures from a majority of the drivers. On September 10, 1999, Smith sent the union a letter providing notice of the company's intent to terminate the current collective bargaining agreement pursuant to Article 23 on November 30, 1999. Until this point, the union was unaware the rollover clause contained the November 30, 1999 date. On September 13, 1999, the company received a petition signed by 46 of 60

6

employees stating they no longer wanted to be represented by the union. Also on September 13, 1999, the company sent a letter to the union stating that effective December 1, 1999, the company would no longer recognize the union as the exclusive collective bargaining representative. The letter further stated the company would continue to administer the agreement until its expiration on November 30. The union did not file a complaint disputing the validity of the anti-union petition. However, soon after September 22, 1999, the union obtained petitions with the signatures of a majority of employees supporting the union. Tr. 355-358, Tr. GC Ex. 27-29.

## V    The lottery program

In a "Management Update" distributed to employees December 1, 1999, the company announced that it was no longer recognizing the union as the employees' collective bargaining representative. Tr. GC's Ex. 27. The notice stated that wages and other employee benefits would not be adversely affected and the company was no longer deducting dues from their paychecks. The notice also informed employees that the company was instituting a monthly lottery program called the "Dedicated Driver Drawing Program" under which $1400 would be distributed each month in a drawing. Id. The letter informed employees that the $1400 represented the amount of union dues the company had been transmitting to the union each month. Under the program, every month the company would hold a

drawing and fourteen employees would win $100 each. All employees were entered in the drawing each month and the winning names were randomly drawn out of a hat. However, employees could increase their number of entries each month by doing good deeds, such as driving extra routes or helping other drivers. The company photographed winners under banners that read "$100 dollar winner" and posted the photos in a public area at the company. Tr. CP Ex. 5

According to Kinney, the union lost significant support after the company withdrew recognition in December 1999. At least five employees resigned since December. One employee, John Kreuger, testified he stopped working at the company because there was no longer a union. Supp. Ex. 7.[3] Membership attendance at union meetings has decreased dramatically since the company decided to withdraw recognition. The union has held three meetings in the relevant time period. Thirty-nine employees attended the union meeting on September 22, 1999; twenty-two employees attended the meeting on November 30, 1999; and on March 9, 2000, only nine employees attended.

## VI  The NLRB charges and petition for preliminary injunction

___

[3]Kinney claims the lack of union representation was a factor for at least five other resignations. Kinney submits affidavits of McGinn, Judith Kernica, the union steward, and Krueger to support this assertion. However, their testimony regarding what other employees told them about their reasons for leaving is inadmissible hearsay and cannot be considered.

8

On September 30, 1999, the union filed a NLRB charge against the company alleging that its decision to withdraw recognition of the union was an unfair labor practice in violation of §8(a)(1) and (5) of the Act. On January 6, 2000, the union filed another charge against the company alleging that its lottery program was intended to reward employees for not forming, joining or assisting a union, in violation of §8(a)(1) and (3) of the Act. The union filed an amended charge on February 2, 2000. After a field investigation, Kinney, on behalf of the NLRB, consolidated the cases and issued an amended consolidated complaint and notice of hearing pursuant to §10(b) of the Act alleging that the company has engaged in unfair labor practices under §8(a) of the Act. Specifically, the amended complaint alleges that the company unlawfully terminated its current collective bargaining agreement and unlawfully withdrew recognition of the union. The amended complaint alleges that discontinuance of dues deductions and institution of the monthly lottery program constitutes unlawful unilateral changes. Also, it alleges that the lottery program was an unlawful promise and grant of benefits to employees designed to erode support for the union. Kinney seeks an injunction pending the outcome of the administrative proceedings pursuant to §10(j) of the Act.

## DISCUSSION

I    Section 10(j) injunction

Section 10(j) of the Act authorizes district courts to grant injunctive relief pending the NLRB's resolution of unfair labor practice proceedings. 29 U.S.C. §160(j). Because the NLRB's administrative proceedings often are protracted, absent interim relief restraining unfair labor practices, a company could accomplish its unlawful objective before the proceeding concludes and thereby render a final NLRB order ineffectual. NLRB v. P*I*E Nationwide, Inc., 894 F.2d 887, 891 (7th Cir. 1990). Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the delay inherent in NLRB administrative proceedings. Kinney v. Pioneer Press, 881 F.2d 485, 493-94 (7th Cir. 1989). An injunction granted under §10(j) is an extraordinary remedy and should be "granted only in those situations in which effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." Szabo v. P*I*E Nationwide, Inc., 878 F.2d 207, 209 (7th Cir. 1989). The burden is on the NLRB director to establish that injunctive relief is "just and proper" in a particular case. 29 U.S.C. §160(j).

To determine what is just and proper, the court applies the traditional equitable standards for preliminary injunctions. NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1567 (7th Cir. 1998); Pioneer Press, 881 F.2d at 490; Lineback v. Printpack, Inc., 979 F.Supp. 831, 839 (S.D. Ind. 1997). To obtain injunctive relief, Kinney must show (1) some likelihood of success on the merits; (2) that there

is no adequate remedy at law and irreparable harm will result if the injunction is denied; (3) the irreparable harm to the petitioner outweighs the threatened harm an injunction would inflict on defendant; and (4) the public interest is served by a preliminary injunction. Kinney v. IUOE Local 150, 994 F.2d 1271, 1275 (7th Cir. 1993); see also Electro-Voice, 83 F.3d at 1566-67 (applying a slight variation of these criteria). The lack of an adequate remedy at law, irreparable harm and public interest elements must be established by a preponderance of the evidence. Electro-Voice, 83 F.3d at 1567. However, the likelihood of success and balancing of the harms are evaluated on a "sliding scale;" a strong showing under one element may offset a weaker showing under the other. Id. at 1568.

In the context of a §10(j) petition, a federal district court has no jurisdiction to pass on the merits of the underlying case before the NLRB. Id. at 1567, citing Squillacote v. Graphic Arts Int'l Union, Local 277, 513 F.2d 1017, 1021 (7th Cir. 1975). In considering the four traditional factors for injunctive relief, "the court's mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual." Electro-Voice, 83 F.3d at 1567. Kinney is not entitled to an injunction simply because she brings a charge; "the

district court will exercise judgment rather than simply sign off on Board requests." Miller v. California Pacific Medical Center, 19 F.3d 449, 458 (9th Cir. 1994). Yet "no rule of law limits injunctive relief to serious and extraordinary circumstances." Pioneer Press, 881 F.2d at 493.

## II    Analysis

### A    Likelihood of success on the merits

To obtain injunctive relief, Kinney must establish some likelihood of success on the merits. Kinney does not need to prove her case by a preponderance of the evidence; this court lacks jurisdiction to reach the merits of the underlying claims. The NLRB will determine whether Kinney has established her case. The district court "must decide whether the Director has a better than negligible chance of success: whether the Director has 'some chance' of succeeding on the merits." Electro-Voice, 83 F.3d at 1568; citing Zipp v. Caterpillar, Inc., 858 F.Supp. 794, 708-99 (C.D.Ill. 1994). "In short, the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." Miller, 19 F.3d at 460.

## 1    The company's decision to withdraw recognition of the union

Kinney alleges the company's decision to withdrawal recognition of the union violated §8(a)(1) and (5) of the Act. The parties do not dispute that under the NLRB's contract-bar doctrine, an employer cannot withdraw recognition of a union during the term of a valid collective bargaining agreement. Thus, if the collective bargaining agreement between the union and the company was in effect when the company withdrew recognition, this would be an unfair labor practice under the Act. Furthermore, the union did not challenge the validity of the petition signed by the majority of employees stating they no longer wanted to be represented by the union. As a result, if the company legally terminated the bargaining agreement, its withdrawal of recognition from the union would be proper. *See* Allentown Mack Sales and Service v. NLRB, 118 S.Ct. 818 (1998) (employer may unilaterally withdraw recognition of union when presented with objective evidence of a union's loss of majority status). In essence, this case is a contract dispute. If the company had the right to terminate the contract on November 30, 1999 in accordance with Article 23, withdrawal of recognition was legal. If not, withdrawal was an unfair labor practice. Therefore, the issue is whether the company properly terminated the agreement.

Kinney argues that the parties reached an agreement with the understanding that the notice date in the rollover provision was to be November 30, 2001, and the contract should be reformed to conform

to the parties' understanding. *See* <u>Americana Healthcare Center</u>, 273 NLRB 1728, 1733 (1985) ("where a written agreement is not in conformity with the actual intention of the parties, a court of equity will reform the writing in accordance with that intention"). If the agreement is reformed to reflect this understanding, the company could not terminate the contract until 2001 and its withdrawal of recognition would violate the Act. Kinney has produced evidence that supports this conclusion. The parties have entered into nine collective bargaining agreements. The eight previous agreements all contained a rollover clause with identical language to the clause in the current agreement. In each agreement, the notice date is the same as the expiration date of the contract. In the current agreement, the parties reached agreement on a three-year contract with an expiration date of November 30, 2001. It was the company that pushed for the three year term. The union desired a two-year contract. The parties never discussed the rollover clause or its notice date during the negotiations leading to the current contract. The negotiations concentrated on charters and the contract drafts used during negotiations simply read "contract term – three years" in place of the termination clause. McGinn testified that the date typed into the termination provision in Article 23, November 30, 1999, was inadvertent and that the date was intended to be November 30, 2001, the expiration date. Kinney argues that if the parties intended for either to be able to terminate the

contract for any reason, there would have been no need to include the reopener. The reopener was expressly limited to bus charters. If, as the company claims, the contract could be terminated for any reason after one year, there would have been no need to include a reopener, especially one that was so limited in nature. Kinney concludes that, given the bargaining history and the obviously incongruent wording between the limited reopener, the duration clause and the rollover provision, the inadvertent notice date in the rollover provision is a mistake that was so obvious as to put the other party on notice of an error. Thus, reliance on the mistake is unreasonable.

Kinney and the union further contend that the company could not terminate the contract on November 30, 1999, even if the contract cannot be reformed. They claim even as written, the rollover clause merely operates to permit either party to give early notice, sixty days prior to November 30, 1999, that it intended to terminate or amend the agreement on the November 30, 2001 expiration date. The clause reads:

> This contract shall become effective the 1st day of December, 1998, and shall remain in full force and effect through November 30, 2001 and continue in full force and effect year to year thereafter, or unless terminated by mutual consent of the parties hereto, or unless either party shall notify the other, sixty (60) days prior to November 30, 1999, or November 30th of any year thereafter, of its desire to terminate or amend this agreement.

Tr. GC Ex. 13. In its *amicus curie* brief in support of Kinney's petition, the union explains that a careful reading of the language makes it clear that termination cannot occur before the three year term expires.

> The lengthy sentence consists of three compound predicates connected by coordinating conjunctions ("and") and two subordinate adverb clauses connected by the subordinating conjunction "unless." The first predicate establishes the effective date of the contract (December 1, 1998) and the second establishes the date through which the contract will remain in effect (November 30, 2001). The third predicate establishes that the contract will automatically continue (rollover) after 2001 unless notice requirements are met to prevent the rollover. The subordinate adverbial clause at issue begins with "unless" and modifies the verb "continue." The contract will continue (after November 30, 2001) "unless" notice to terminate is given, in 1999 or in 2000 or in 2001 to prevent rollover for another year after November 30, 2001 (i.e. to November 30, 2002).

Union brief pg. 7. In essence, Kinney and the union conclude that the sentence reads: the contract term is from December 1, 1999 to November 30, 2001, and will rollover each year after 2001 unless proper notice is given.

Finally, Kinney contends the notice provision date can be characterized as a clerical error. Where there is a mistake due to a clerical error, courts can grant appropriate relief. S.T.S. Transport Serv. v. Volvo White Truck Corp., 766 F.2d 1089, 1093 (7th Cir. 1985). Similar to a mutual mistake, where there is an agreement between parties and the written agreement does not reflect the agreement due to a clerical error, such as incorrectly transcribing numbers, a court of equity will reform the writing in

16

accordance with the parties' intention.  Id.  Kinney claims the union committed such an error by entering 1999 instead of 2001 for the notice date in the rollover provision and that the contract should be interpreted to reflect the parties' true intention.

The company claims Kinney is not likely to succeed on the merits because it properly terminated the bargaining agreement.  The company contends that even if the contract is ambiguous, the union is bound by the language because the union drafted the contract. County School Bus claims that as far as the company was concerned, the Article 23 notice date was correct.  If there was a mistake, it was a unilateral mistake on the union's part.  A unilateral mistake of one party may not be relied upon to relieve that party from its obligations where the party's own negligence resulted in the mistake.  Granite Construction Co., 330 NLRB No. 19, 1999 WL 1087048 (NLRB 1999); Ameropan Oil Corp. v. Monarch Air Service, 1994 WL 86701 *8 (N.D. Ill. 1994).  The company concludes reformation is improper and the union is bound by the contract language.  The company claims the termination clause clearly and unambiguously permitted it to terminate the agreement by giving notice sixty days prior to November 30, 1999.  If the contract is unambiguous, the parol evidence rule bars extrinsic evidence under Illinois law. Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1037 (7th Cir. 1998).  Therefore, the parties' subjective belief is not admissible to establish ambiguity.  CSX Transportation, Inc. v. Chicago and North Western Transp. Co., 62 F.3d 185, 189 (7th Cir. 1995).  The

17

company claims its interpretation of the contract is reasonable and that it is consistent with the reopener provision. It concludes that by giving notice of its intent to terminate the agreement sixty days prior to November 30, 1999, it properly terminated the agreement and was free to withdraw recognition from the union.

Kinney has established there is a more than negligible chance she will succeed on the merits before the NLRB. Kinney presents a formidable argument that the contract does not reflect the parties' agreement and should be reformed in accordance with their intent. Considering the bargaining history and the presence of the reopener clause, there is a strong probability the NLRB will determine that the parties intended the notice date to be November 30, 2001 and that the company did not have the right to terminate the contract in 1999. Similarly, the union's grammatical analysis of the termination clause, although inartful, has merit. The agreement appears to be ambiguous. The union's interpretation is reasonable. When read in conjunction with the limited reopener, the company's interpretation is suspect. Kinney has shown more than a negligible chance of success.

### 2  The lottery program

Kinney claims the company's lottery program is an unfair labor practice and an independent violation even if the company legally withdrew recognition from the union. She alleges the lottery was initiated to discourage employees from unionizing. Kinney contends

that tying the lottery to union dues interferes with, restrains, and coerces employees in exercising their rights to form, join or assist labor organizations under §7 of the Act. The company concedes that if it improperly withdrew recognition of the union, its lottery program would violate the Act. Because Kinney has established some likelihood of success in proving that the company improperly withdrew recognition of the union, she has shown some likelihood of success on the lottery claim as well.

**B    Adequate remedy at law and irreparable harm**

To establish the need for injunctive relief, Kinney must show that the failure to grant an injunction would cause irreparable harm. She must make this showing by a preponderance of the evidence. In making this determination, the court "must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." Miller, 19 F.3d at 460. Section 10(j) relief is appropriate when, absent an injunction, the efficacy of the NLRB's final order may be nullified or frustrated during NLRB proceedings. *see* Asseo v. Centro Medico Del Turabo, Inc., 900 F.2d 445, 454 (1st Cir. 1990).

Kinney claims irreparable harm will result unless the company's conduct is enjoined. She asserts that the time that will elapse while pursuing a remedy through NLRB proceedings will irreparably harm the employees' efforts to exercise their rights under §7 of the

Act. She claims the passage of time will continue to erode employee support of the union, deprive employees of their right to union representation and allow the company to permanently achieve the object of its unlawful conduct. This result will continue to chill employees' support for the union as well as diminish their present right to be represented by the union under §7 of the Act. The union claims that the company is unconcerned about losing this case on the merits, because just depriving employees of their rights under the agreement and keeping the union representatives out while the case is pending accomplishes its purposes of getting rid of the union and the collective bargaining agreement. In essence, Kinney and the union argue that in the absence of recognition, the union is unable to represent the interests of employees and this is likely to lead to a loss of support for the union that cannot be remedied by a final NLRB order on the merits.

The company contends there will be no irreparable harm if the injunction is not granted. It contends dues money is really at issue and there is an adequate remedy at law because Kinney could seek an order requiring the company to reimburse the union for lost dues. The company claims it is the employees who will be harmed by an injunction because they will be forced to contribute union dues despite having legitimately chosen to rid themselves of their union. The company points out that the whole dispute began with a majority of employees petitioning the company to cease union recognition. It further claims Kinney's allegations that support for the union

20

would be stifled or chilled is speculative and does not warrant an injunction. Finally, the company contends that there is no irreparable harm because it has promised to follow the collective bargaining agreement until December 2001, except for recognition of the union and payment of union dues.

Kinney has shown there is no adequate remedy at law and that irreparable harm will occur absent injunctive relief. There is the danger that the company will be able to reap the benefits of allegedly illegal conduct even if it eventually loses on the merits before the NLRB. By the time the NLRB reaches a final decision, the employees may be without union representation for years. As a result of passage of time, employee support for the union may "erode to such an extent that the Union could no longer represent those employees. At that point, any final remedy which the Board could impose would be ineffective." <u>Asseo v. Centro Medico Del Turabo, Inc.</u>, 900 F.2d 445, 454 (1st Cir. 1990). The Seventh Circuit emphasized the importance of the passage of time to this analysis in <u>Electro-Voice</u>:

> As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process. For the same reasons we conclude that there is no adequate remedy at law.

83 F.3d at 1573. This reasoning applies here. Even if Kinney eventually prevails, the company may have cut the employees off from

21

the union long enough to make it nearly impossible for the union to return. Furthermore, if the union is eventually reinstated by the NLRB, it may lack the support to bargain effectively and the employees would be irreparably deprived of their right to collective representation.

Kinney has produced evidence that the union has lost and will likely continue to lose support as a result of the company's conduct. Attendance at union meetings has dropped significantly since the company withdrew recognition and initiated the lottery program. The company has a large turnover in personnel and, without recognition, union support is likely to decrease due to this turnover. As union supporters leave the company, union support is likely to decrease because new employees will be less likely to support the union absent the benefits of representation. A former employee, Kreuger, testified that one of the reasons he left the company was because the union was no longer there. Finally, by initiating the lottery and tying the lottery amount to union dues, the company makes it likely union support will deteriorate further. The program rewards employees for not being represented by the union. Without injunctive relief pending completion of NLRB proceedings, the company will reap the benefits of its alleged misconduct. Kinney has established irreparable harm and that there is no effective remedy at law. Electro-Voice, 83 F.3d at 1573.

The company claims there is no irreparable harm, and there is an adequate remedy at law, because the dispute is really about union

dues.  This argument ignores the teaching of <u>Electro-Voice</u> on the effect the passage of time can have on employee support for the union.  *See* <u>Electro-Voice</u>, 83 F.3d at *1573;see also* <u>Asseo</u>, 900 F.2d at 454.  A final NLRB decision reinstating the union and ordering the company to reimburse the union for lost dues would not return the parties to the *status quo*.  As <u>Electro-Voice</u> makes clear, the irreparable harm in this situation is the loss of employee support for the union and the likelihood employees will be irreparably deprived of union representation as a result.  83 F.3d at 1573. Contrary to the company's claims, the repayment of union dues is not an adequate remedy at law.

The company further contends that Kinney's claims that union support would be stifled absent injunctive relief are speculative and does not warrant injunctive relief.  It relies on <u>Szabo v. P*I*E Nationwide, Inc.</u>, 878 F.2d 207 (7th Cir. 1989).  In <u>Szabo</u>, the court held that mere speculation employees' rights would be chilled does not create irreparable harm and does not support the need for injunctive relief.  <u>Id.</u> at 210.  However, in <u>Szabo</u> , the court based its decision on the lack of evidence of chilling effects on other employees.  <u>Id.</u>  Kinney has presented evidence that support for the union has deteriorated and will continue to dwindle as time passes. Furthermore, <u>Szabo</u> dealt with the termination of a single employee and stressed that other employees were aware of the situation only because the fired employee told them about it.  <u>Id.</u>  *See also*

23

*Lineback* 979 F.Supp. at 849 (distinguishing <u>Szabo</u>). The company publicly withdrew recognition of the union and initiated a lottery program that involves all its employees and publicly recognizes the winner each month. Unlike <u>Szabo</u>, all employees are without union representation and are consistently rewarded for the union's absence by the monthly lottery.

Finally, the company contends injunctive relief is not necessary because employees do not want or need union representation. It points out that a majority signed a petition stating they no longer wanted to represented by the union before the company terminated the contract. The employee petition does not defeat Kinney's showing of irreparable harm. Another petition circulated by the union and signed by a majority of employees a few days after the company announced withdrawal of recognition suggests employees supported the union and wanted to keep it as their bargaining representative. More importantly, under the contract-bar doctrine, if the company illegally terminated the agreement, it could not withdraw recognition of the union regardless of either employee petition. The company further claims employees will not be harmed without an injunction because it has promised to follow the collective bargaining agreement until December 2001, except for recognition of the union and payment of union dues. However, the irreparable harm alleged by Kinney goes beyond the contract provisions of the collective bargaining agreement. Kinney has

established that there is a very real danger that if the company continues to withhold recognition from the union and continues its lottery program, employee support will erode to such an extent that the union could no longer effectively represent the company employees.

### C    Balance of harms

There is a real danger that the company's withdrawal of union recognition and the initiation of the lottery program have weakened and will likely irreparably harm employees' support for the union over time.   In contrast, the company acknowledges it would not be harmed by an injunction.   It has agreed to abide by the collective bargaining agreement until December 2001 and does not claim it would be significantly harmed by an injunction in any other way.   The balance of harms favors temporary injunctive relief.

### D    Public interest

Finally, the court examines whether an injunction is in the public interest.   The court weighs the potential public benefits against the potential public cost.   Electro-Voice, 83 F.3d at 1574. In §10(j) cases, the public interest is furthered by ensuring an unfair labor practice will not succeed because the NLRB takes too long to investigate and adjudicate the charge.   Id. (citing Miller, 19 F.3d at 460).   Similarly, the public interest is harmed when the NLRB's remedial powers lose their effectiveness due to the passage of time.   Lineback, 979 F.Supp at 487.   An injunction is in the

public interest when the provisions of the Act are enforced. Here, there is evidence that the effectiveness of the NLRB's remedial powers may be circumscribed without injunctive relief. There is a probability that by the time the NLRB orders a remedy, the remedy would be useless. There is no evidence that public harm would result from injunctive relief.

## CONCLUSION

Kinney has established that injunctive relief is just and proper. She has established some likelihood of success on the merits, that there is no adequate remedy at law and irreparable harm would result absent an injunction, that the balance of harms favors injunctive relief, and that a temporary injunction is in the public interest. Therefore, the company is bound by the collective bargaining agreement, and is ordered to recognize the union and to cease operation of its lottery program pending the NLRB's final decision on the merits.

ENTER:

Suzanne B. Conlon
United States District Judge

May 30, 2000

26